*Ghols'on, J.
The Columbus, Piqua and Indiana Eailroad Company was incorporated by a special act, passed February 23,1849, *304 with a capital of $2,000,000, and was organized in February, 1850. By the act of incorporation it is provided, that the directors of said company “shall be entitled to have and enjoy, and are hereby invested with, all the rights, privileges, powers, and franchises, and be subject to all the restrictions, of the act regulating railroad companies, passed February 11, 1848.” The company was authorized to construct and maintain a railroad from Columbus, by Urbana, Piqua, and Greenville, to the west line of the State of Ohio. It was, authorized to demand and receive, for the transportation of jiassengers and property on its road, a compensation not exceeding certain rates specified in the act.
By section 1 of the act of 1848, it is provided:
“Seo. 1. That whenever any number of persons, not less than five, shall be named as corporators in any act of the general assembly, and authorized to construct a railroad, they and their associates,, successors, and assigns, by the name and style provided in said act, shall thereafter be deemed a body corporate, with succession, with power to sue and be sued, plead and be impleaded, defend and be defended, contract and be contracted with, acquire and convey, at pleasure, all such real and personal estate as may be necessary and convenient to carry into effect the objects of the incorporation.”
The company thus incorporated and organized, proceeded to acquire rights of way, to construct and equip its road. It was, at the time of the commencement of the action, in possession of its road and equipments, and was operating the same. The present controversy has arisen from the conflicting claims of creditors. Several of the questions which are presented, require an inquiry into the general powers of the company to dispose of its property, *and into the liability of that property to be subjected to the payment' of its debts.
A corporation invested with a power to acquire and dispose of property, so general and extensive as that contained in the section which has been quoted, can only be limited in regard to the purposes for which the property is acquired or disposed of, -or from the nature of the property. It is stated in the elementary works that the mere grant to be a body corporate, would give, in the absence of any restriction, the power to acquire and dispose of property. Grant on Corporations, 4. Some restriction, however, is generally found either in the object of the corporation, or in the nature of the propei’ty. When such a restriction does not apply, a corpora *305 tion may very properly be regarded as occupying the position of an individual owner. There would be the same right of voluntary alienation, and a like liability to involuntary alienation. What the company could convey, its creditors might subject. In the absence of some express legal exemption, “it is an inseparable incident to property, legal or equitable, that it should be liable to the debts of the owner, as it is to his alienation.” Hough v. Cress, 4 Jones Eq. 295-297. In this view we must construe the provision of the statute, that “the real and personal property of corporations shall be liable to execution as other property.” Swan’s Stat. 231.
That statute was not intended to authorize the sale of any property which, from its nature, a corporation could not alienate, and •which an individual could not take by purchase from a corporation. It does not extend to what are denominated the franchises of the corporation. In the case of a railroad corporation, its franchises and corporate rights are not alienable, without express authority of law. Nor do we think the general language of the first section of the act of 1848, which confers the power to “ acquire and convey, at pleasure, all such real -and personal estate as may be necessary and convenient to *carry into effect the objects of the incorporation,” is to be understood to authorize a railroad corporation to convey all the rights and interests in property which it may acquire. Like many other general words, they must be “ restrained unto the fitness of the matter.” When power is given to acquire an interest in real estate for the single and exclusive purpose of the exercise of a franchise, and particularly when to acquire such interest, there is a delegation of the power of eminent domain, the interest cannot be separated from the use to which alone it can be applied, and if the franchise can not be conveyed, neither can the interest in real estate, with which it is connected. Redfield on Railroads, 128. But the principle does not necessarily apply to things brought on the land, in which such a limited interest has been acquired. How far these may be alienated by the corporation, or be subjected for its liabilities, will depend, upon different considerations.
The corporation having acquired an interest in land for the construction of its road, in that construction affixes to the land certain things—the timber and iron for the track, the stone and timber for bridges and culverts. It also-erects depots, and structures for a supply of water. The road is not regarded as constructed and pre *306 pai’ed for use until such things are affixed. But when the road is ■thus constructed and ready for use, other things are requisite for ■that use—locomotives, cars, and other articles and materials, some -of which are consumed in the use, and the supply has to be, from time to time, renewed. Now, we think there is a manifest distinction between the road as constructed for use, and the various things -employed in that use, and that the latter can not, with propriety, be regarded as constituting a part of the real estate, but are the personal property of the corporation.
We are not called upon, in this case, to decide what, in the event •of a determination of the use for which interest in real estate was obtained, would be the respective rights *of the owners of the real estate, and the creditors of the corporation, in those things affixed in the construction of the road, and which might be separated from the land, and would have a value when so separated. We are not called upon to decide, whether either such owners or the state could object to such a separation for the purpose of paying the just debts of the corporation. When those questions arise, it may be necessary to determine, whether the rule as to fixtures, between vendor and vendee, or landlord and tenant, can be justly and •equitably applied? But we have no hesitation in coming to the •conclusion, that what we have described as the personal property •of the corporation, employed in the use of its road and franchise, is liable for the payment of its debts. We think the line can be -clearly drawn between the interest in real estate and the franchise connected therewith, and the movable things employed in the use -of the franchise.
The distinction appears to us to be as plain as that between a •farm and the implements and stock which the proper use of the farm necessarily requires. There are instances which may be put ■still more analogous. Take, for example, a ferry franchise. It is connected with real estate ; it is itself an incorporeal hereditament, •and therefore real estate. The use of this franchise requires boats and other movable appliances. But these, when employed in the use of the ferry franchise, do not thereby become a part of the real estate; they are the personal property of the owner of the ferry franchise, or, it may be, of some person to whom the ferry franchise has been demised for a term of years.
Considerations of public policy and convenience have been •pressed upon our attention in connection with the question under *307 «examination. It may be true that a railroad corporation holds its property, in a certain sense, as a public trust—to answer the purposes of a public highway, the transportation of persons and property. But ids consistent with that public trust to contract obligations. ^Indeed, the very exercise of the trust necessarily involves obligations to individuals, and to meet those obligations, the property of the corporation must in some form be liable. The .question is, in what form ? Shall it be in the ordinary legal form •applicable to the property of individuals, or shall peculiar rules be introduced, which may have the effect to delay creditors, and operate as a shield to protect property from their just demands.
¥e have been told that the sequestration of the tolls of a turnpike company furnishes an analogy which may be properly followed. It is necessary to guard against a very common error, of ■■acting on that which affords an argument by analogy, as if the resemblance in some particulars constituted an identity in all. Hooper v. Lane, 6 H. L. Cases, 443-549. The analogy is very imperfect between the tolls exacted for the use of a turnpike, and the compensation charged by a railroad company for the transportation of persons and property. The right to exact the one, and the ■earning of the other, involve very different duties and responsibilities. To place persons in toll-houses to collect tolls for the use of ¡a turnpnke, and to place a person or persons in the charge of a .railroad, with all the various appliances necessary for the transportation of persons and property, are certainly very different matters. The one is the simple appointment of agents to receive money, and, perhaps, to expend a part of that money in the repair -of a highway for ordinary travel; the other is a business requiring the use of property of various kinds, and the employment of persons of varied skill and capacity, to be exercised not only in man.agement and supervision, but in particular details—a business requiring those having it in charge to enter into contracts and incur obligations, which concern numerous individuals, and affect the safety of their persons and property.
A court of equity, as a temporary measure, during the pendency ■of a litigation, for the preservation of property *and to prevent its waste and destruction, might undertake, by means of a receiver, such a business. And it may be that the circumstances •of a case might present such equitable considerations, arising from nn unforeseen disaster, or from other cause which we need not *308 conjecture, that a court of equity might bo justified in staying the hand of a creditor asserting his legal rights, in some form consistent with his ultimate security, so as to prevent, for a limited period, the separation of the personal from the real property of a railroad company, and the cessation of its business. But that as an ordinary measure of relief, for an indefinite period, and for the-purpose of earning money, the business of operating a railroad may be undertaken by a court of justice, is a proposition which,, we think, can not be maintained. It would, we think, be a departure from the proper and ordinary functions of a court of justice, and be attended with intolerable mischief and inconvenience. And this alone is a sufficient reason against the adoption of any principle upon the ground of analogy. Wild v. Hobson, 2 V. &. B. 105-113.
' If we are at liberty to suggest, on what the legislature very probably relied for the continued operation of a railroad once constructed, we should say it was the interest of its owners. If it can, be operated profitably, the interest of those concerned will rarely, if ever, fail to keep it in operation, so as to subserve the public use. If it can not, we know of no mode by which the state can compel, those by whom it was constructed to operate it at a loss; and certainly there is no mode provided by which it can be operated at. the expense and risk of the state. The prudence of such a course-could find few or no advocates. We are satisfied that it is not the policy of the state, nor just to individuals, that the power of a court should be invoked to enable an insolvent corporation to operate a railroad, by protecting its property from the claims of creditors—of those who have performed for it labor, or have suffered losses or sustained injuries by the misconduct of its agents. *We think that the true policy of the state requires that, just demands should be met, and that the property of those against, whom they exist should be applied for the purpose.
The views we have expressed are sustained by decisions in other-states. In a case decided in Illinois, it is said: “This road and the-furniture do not constitute one entire estate, either real or personal. The furniture is personal property, and constituted no part of the road, which is real property. It is no more a part of the road than is the furniture of a house a part of the house. A house and its furniture may be sold or leased together, but that does not change the character of the property of either. It may be true, as was- *309 said upon the argument, that the road would be of little value without rolling-stock, and that the latter would be equally useless without the former. Their dejoendence on each other does not prove that both constitute but one thing. The furniture of the road may he removed from it, and used elsewhere, without injury to, or impairing the value of, the road itself.” Sangamon and Morgan R. R. Co. v. County of Morgan, 14 Ill. 163-166.
In the case of Pierce v. Emery, 32 N. H. 484-508, it is said of a railroad company: “They may sell or mortgage their personal property, but they can not sell or mortgage with it the right to manage and control the road, nor any other corporate right or franchise.” . . . “ They may contract debts; may purchase on credit; and we see nothing in the nature of their business, or in their relations to the public, which should prevent them from making a valid mortgage of their personal property not affixed to the road, though used in the operation of it.” Id. 504. And in that case, mortgages on the furniture and equipments of the road were sustained as valid. “ But,” it was said, “the complainants have no right in the road by virtue of those mortgages. They must assert their security by taking the projoerty away, as in the case of a mortgage by an individual.” Id.
*In a case in Connecticut, involving the question of the application of an insolvent law to a railroad corporation, it was claimed that railroad corporations were excluded from its operation, upon grounds of public policy and convenience, such as have boon urged in this case. But the court said : “ The reasons urged for distinguishing between railroad companies and other private business corporations, do not strike us with any considerable force, while justice obviously requires that the creditors of that particular class of corporations should have the same protection for their debts, as is provided for the creditors of other similar corporations. So far as the railroad company itself is concerned, it is entitled to no special immunity in this respect as to its creditors; and as to .any inconvenience to the public by temporary or permanent cessation of its business, consequent upon proceedings in insolvency .against them, the necessity of which cessation, however, is .not apparent to us, such inconvenience would be the same in kind, and would differ only in degree, from that which would attend similar proceedings against any other private corporations which have boon mentioned; and would be' the same only as if their business *310 were conducted by natural persons who had become insolvent, and therefore liable to those proceedings. The appellants further insist that railroad companies were not intended to be embraced by the-insolvent law, on the ground that the trustee appointed under it would not be invested with the power of selling, leasing, or operating the railroad, and, therefore, that the most valuable portion-of its property would not be made available for the payment of its-debts. We do not deem it necessary to'express any opinion on the legal principle affirmed in this objection; for, if it is correct, it falls-far short of sustaining the inference' claimed from it. That some-of the property of the comjjany is of such a peculiar character, that the trustee could not, by his own unassisted power, dispose of or manage it for the benefit of creditors, would be an insufficient ground for concluding that the legislature did *not intend; that they should have the benefit of such of its property as he-could appropriate to their use. And we would add, in regard to-other property, if there should be any in which the company would have a valuable interest, without undertaking to prescribe the particular course to be taken with it, which would now be premature,, we can not but think that a method could be devised by which it could be made available to creditors.” Piatt v. New York & Boston R. R. Co,, 26 Conn. 514-573.
In a recent case in New Hampshire, the right of a creditor to-levy upon the movable property of a railroad was directly involved, and the court held that “the locomotive engines and freight and passenger cars of a railroad corporation are liable to attachment, when not in actual use, like other personal property.” In that case, as in this, principles of public policy and convenience, and the-public use, were brought forward in argument. But the reply of the court in conclusion, was: “The property of individuals who owe duties to the public is not, for that reason, exempted from liabilities to this ordinary process of the law, except so long as it is in actual use in the discharge of that duty. Such is the case of the contractor to carry the mail. It has never been held that tho steamboat, or coach and horses, used in the conveyance of the mail, were exempt when not in use. Considering, then, that it is not necessary, for the discharge of the public duties of these corporations, that they should be the owners of cars or engines—many such roads being operated by the cars of other corporations; that it is a matter of great uncertainty what articles of the personal *311 property of such corporations are necessary for the discharge of their public duties; that no means exist by which it can be determined what is necessary, or otherwise; that it must be very difficult for courts to lay down any definite rule by which officers can be guided, who, in such cases, must decide at their peril; it seems to be neither judicious nor expedient to establish an exemption of this kind, unless it is done by the direct ^action of the legislature, who can provide the proper rules and safeguards for the safety of officers as well as of parties.” B. & C. M. Railroad v. Gilmore, 37 N. H. 410-423.
The order of our inquiry next calls for an examination into the-nature and character of the franchises of the corporation. It has. been said “the essence of a corporation consists in a capacity: 1. To have perpetual succession under a special name and in an artificial form; 2. To take and grant property, contract obligations, sue and bo sued by its corporate name, as an individual;, and, 3. To receive and enjoy, in common, grants of privileges and immunities.” Thomas v. Dakin, 22 Wend. 71. Each of these applies to the corporation under consideration. Under the first two. is described what may be termed the franchise of the corporators, or individual members of the corporation, and under the last what, may be termed the franchises of the corporation. As said in a recent case: “A corporation is itself a franchise belonging to the-members of the corporation ; and a corporation being itself a franchise, may hold other franchises, as rights and franchises of the corporation.” Pierce v. Emery, 32 N. H. 484-507.
By the act incorporating the Columbus, Piqua and Indiana Eailroad Company, certain persons named as corporators, their associates, successors, and assigns, became a body corporate. This was the franchise of the corporators. By the same act, or the general law to which it referred, this body corporate received the franchise of constructing and maintaining a railroad. It may well be, that for the purpose of a judicial proceeding, to declare a dissolution of the corporation, these two franchises may be regarded as indivisible. And in this view it was said : “ That the franchise of being a corporation for one general purpose, as to erect and make profit from a turnpike, to bank, insure, or the like, comes within the doctrine which denies that a franchise is divisible, would seem to be quite plain.” The People v. B. & R. Turnpike Co., 23 *Wend. 222-243: Cowen,J. Indeed, it can not-be regarded as *312 unreasonable to hold that the capacity to receive and enjoy the franchise of constructing a railroad, and making profit therefrom, being the only object and purpose of the grant of a capacity to be a corporation, when the former is lost, it should be adjudged a dissolution of the corporation. But the reason upon which the indivisibility of a franchise proceeds, when a question of forfeiture arises, m.ay not apply in other cases. It has no application, when the question is as to the construction of an authority to dispose of the franchise which belongs to the corporation, as distinguished from that which appertains to the individual members. If the corporation is authorized to dispose of the franchise to maintain and make profit from a railroad, while a capacity to take from it this franchise, and the right to maintain the railroad and make profit from its use, as such, would necessarily be given to the party to whom it might be disposed ofunder the authority, it would, by no moans follow that the further capacity to be a corporation would be conferred. The right to take the road, with the franchise of making profit from its use, might be implied from the authority to dispose, but the implication would be extended no further than was necessary. And here-it may be observed, that after an act of disposition, which separates the franchise to maintain a railroad and make profit from its use, from the franchise of being a corporation, though a judgment of dissolution may be authorized, yet, until there be such judgment, the rights of the corporators, and of third persons, may require that the corporation be considered as still existing. When that judgment is had, those rights would be protected.
These views are strengthened by the consideration that, as to the transfer of the one franchise, there is a consistency and propriety arising from its nature and character, that does not apply to the other. This distinction has been clearly pointed out in a recent case, in which it is said : 11 Among the franchises of the company is that of *being a body politic with rights of succession of members, and of acquiring, holding, and convoying property, and suing and being sued by a certain name. Such an artificial being only the law can create ; and when created, it can not transfer its own existence into another body, nor can it enable natural persons to act in its name, save as its agents, or as members of the corporation, acting in conformity with the modes required or allowed by its charter. The franchise to be a corporation is, there *313 fore, not a subject of sale and transfer, unless the law, by some positive provision, has made it so, and pointed out the modes in which such sale and transfer may be effected. But the franchises to build, own, and manage a railroad, and to take tolls thereon, are not necessarily corporate rights; they are capable of existing in, .and being enjoyed by, natural persons; and there is nothing in their nature inconsistent with their being assignable.” Hall v. The Sullivan Railroad Co. 22 Law Rep. 138-140: Curtis, J. Very similar language is used in a recent case in Vermont. Bank of Middlebury v. Edgerton, 30 Vt. 182-190.
In this connection it is proper to notice a power delegated to railroad corporations—that of taking land for the use of the road, by a j udieial proceeding instituted for the purpose. This proceeding is regulated by a general law, and can only be instituted by a ■corporation, there being no provision for a recourse to it by a private individual. This circumstance has been pressed as one having an important bearing on several of the questions in this case. The right to institute such a proceeding can, in no proper sense, be regarded as a franchise of the corporation. It is rather a means to secure the enjoyment of the franchise granted, a resort to which may become necessary. It usually is necessary to accomplish the •object intended, and, undoubtedly, the faith of the legislature may be regarded as pledged, that some proper mode will be provided for the accomplishment of that object. But until the prescribed mode has been adopted and the land ^obtained, that which is to be done by the legislature, or the tribunals acting under its authority, can only be regarded as executory. There is no franchise— no grantor contract executed—such as a franchise has been held to be. When by a resort to the mode authorized by law, the interest in the land has been obtained, then the power is executed, and the enjoyment of the franchise to that extent secured.
There is nothing in the nature of such a power, which forbids its exercise by an individual, when delegated for a purpose of a public nature. Instances of its exercise by individuals, under the law of England and of some of the states, are well known. Wo need only mention the proceedings by a writ of ad quod damnum, to condemn land for the purpose of a mill. If, then, in any disposition of a railroad, and the franchise of making profit from its use, authorized by law, the ownership and control should pass into the hands of individual owners, and for any purpose of construction, or change *314 of location, a resort to such a power becomes essential, such individual owners may safely look to the legislature for an extension* of the provisions of the general law. They might justly say, that if they were authorized by law to acquire the road and the franchise-of operating it, foi’. their own benefit and for public use, the legislature would be bound in good faith to afford the usual and necessary means to render the grant made under its authority effectual for the purpose intended. In this respect they would stand, in point of legal right, upon like footing as the original constructors of the-road; neither having strictly the right which, as against the action of the legislature, could be enforced—one relying upon the faith of the legislature that the mode existing would be continued, and-the other, that a proper mode would be adopted. We certainly can. not hold that such a delegation of the power of eminent domain can be made the subject of grant or of sale. But we do not regard this as any objection to the transfer, to individual owners, of the-^franchise of maintaining and operating a railroad, if it otherwise apj>ears to be authorized by the legislature.
From observations upon the general powers of the corporation,, and the nature and character of its rights and franchises, we proceed to a consideration of those special powers which the questions-in this case involve. By the 13th section of the act of 1848, regulating railroad companies, it was provided: “ Such company shall have power to borrow money on the credit of the corporation, not exceeding its authorized capital stock, at a rate of interest not exceeding seven per cent, per annum, and may execute bonds and promissory notes therefor, and to secure the payment thereof may pledge the property and income of such company.” By the 4th section of an act to amend the charter of the Columbus, Piqua and Indiana Railroad Company, passed March 12, 1851, it is enacted: “That the directors of said company are hereby authorized to bor'tow, upon the credit of the same, any sum or sums of money which may be necessary to finish and furnish its road; and for said loan or loans, to make and execute in the name and on behalf of said corporation, such bonds, promissory notes, or other evidences of debt, and payable at such time and places as shall be agreed on by the respective parties so contracting. And for the purpose of securing the payment of the money so borrowed, said directors may pledge, by mortgage or otherwise, the entire road, fixtures, and equipments, with all the appurtenances, income, and resources *315 thereof, as far as the same can be done without prejudice to the-previous and existing liens on the same.”
We have to inquire how far those special provisions extended the powers of the corporation in the disposition of its property, and, in. the first place, whether they authorized the pledge or mortgage of its franchises, or any of them. In our opinion, in view of the remarks which have been before made, they did not authorize the pledge or mortgage of the franchise of being a corporation which ^appertained to the corporators or individual members of the corporation. The provisions evidently have reference to the property of the corporation, and not to personal rights. No provision is made by which a transfer of the corporate existence can be effected. In the absence of such a provision, we know of no-mode which we could adopt by analogy. To provide a mode would, be legislative, not judicial, action.
The- same objection does not apply to the franchise of the corporation to maintain its road and make profit from its use. That franchise is so far connected with the real estate of the corporation,, that by and with a-sale and transfer of the one, the other may well pass, if such appears to be the intention of the legislature. We-have carefully considered the provisions which have been cited,, and are of the opinion that it was the intention of the legislature-to authorize a pledge or mortgage of the franchise of the corporation to maintain and operate its road. The corporation is authorized to pledge, not only its property—described in the special, act as its “ entire road, fixtures, and equipments, with all the appurtenances”—but also the “income and resources thereof.” To make this pledge an effectual- and substantial security, such as was-evidently contemplated and understood by those to whom it was-offered, the right to use the property in the only mode by which it could produce an income, is absolutely essential. Any other construction of the power would be manifestly unjust.
We have to inquire, in the next place, whether the provisions so. extended the powers of the corporation as to authorize a pledge or mortgage of property not existing, or not owned by the corporation, at the time of the pledge or mortgage, but to be thereafter-acquired. It is admitted that the general powers of the corporation, being in this respect no greater than those of an individual, would not authorize a legal pledge or mortgage of such property. In this state, under the construction of our registry laws, *it *316 -is quite clear that a mortgage of lands to be afterward acquired, being a mere contract to convey such lands as a security, or, as it has been termed, an equitable mortgage, can have no validity against third persons who acquire legal interests in, or liens upon, the property. “The legal rights of such persons can not be displaced at the instance of the holder of a prior unrecorded mortgage, or contract for a mortgage, although acquired with notice of such mortgage, or of the existence of such contract; the object of the law being to avoid all the vexed questions of notice, actual or con- ■■ structive, in determining priorities of lien. So far as may be necessary to their protection, such a thing as an equitable mortgage is wholly unknown.” Bloom v. Noggle, 4 Ohio St. 45-54.
The act regulating the record of chattel mortgages does not, as to purchasers or subsequent mortgagees, admit of the same con- • struction; as to them, the courts are left at liberty to say that, if they Have notice, they are not to be preferred. As to creditors, a legal mortgage of goods and chattels not recorded, though there was notice of its existence, would be invalid. An equitable mortgage of like property, upon the principle applied in case of real estate, ought not to have any greater effect. But a mortgage of goods and chattels, whether in the form of a conveyance or of a contract to convey, and whether applying to property in possession or to be acquired, if possession be taken of the property conveyed -or intended to be conveyed, would create a valid lien against creditors, attempting to subject such property to their claims, after pos- ■ session so taken. Chapman v. Wiemer, 4 Ohio St. 481.
As to the transfer of a title, a mortgage of goods and chattels to be subsequently acquired, would stand upon the same ground in law and in equity. It could give “ no legal title, nor any equitable title, to any specific goods.” Congreve v. Evetts, 10 Exch. 298, Parke, B. It would amount to no more than an executory contract. In equity it might be regarded as a claim for a title, to be perfected *by possession taken with the assent of the grantor or under his authority, or by a specific performance. It is well known that courts of equity do not ordinarily enforce contracts for the delivery of articles of personal property, but there are cases in which it has been done. They proceed upon the ground that there are peculiar circumstances showing that a legal remedy is inadequate. Now, we need not decide, in this case, whether a purchaser of personal ¿property, with notice' of a claim under contract which there would *317 be a right to have specifically enforced, would not be affected by ' that equity. No such question arises in this case, and we have said enough to meet any question that does arise, and also to show that the corporation, under its general powers, could make no moiffgage ■ of subsequently acquired property that could operate as a substantial security, either at law or in equity. The claim upon such a security worild bo invalid, as to the real estate of the corporation, against both creditors and purchasers; as to its personal property, it would be invalid against creditors until possession was taken, and doubtful against purchasers.
There being, then, this defect in the general powers of the corporation, was it the intention of the legislature to relieve by a grant of special power? It is, we think, important to consider that, to • give an effectual security for the advance of a large amount of money (and such an advance was clearly contemplated), power was •required: 1. To pledge or mortgage the franchise of the corporation connected with its road; and, 2. To pledge or mortgage the property which would necessarily be acquired in finishing and furnishing its • road, and in its use, until the period for which credit was given should elapse. The very necessity for power in these two particulars, furnishes strong ground to suppose that it was the object to grant such power. It is a rule in the construction of statutes which are intended, to furnish a remedy or afford relief, to consider the extent of the remedy required, and the nature *and character of the relief which the exigency of the case demands. The two particulars mentioned are closely connected, and both appear to be essential to the accomplishment of the object in view of the legislature. The same reasons which would apply to induce a grant of the one, also apply with full force to the other. The language is equally applicable to both. The pledge is to bo of the property and income. The income intended must have been the future income, and was to be produced by property in possession and to bo acquired. If the future product can be conveyed, why not that by which it is created ?
Wo have shown the general powers of the corporation, as to the • disposition of its property, in view of the creation of a security for monejr borrowed; and we have shown the particulars in which those powers were defective. If special power was conferred, look ing expressly to the creation of such a security, it is fair to conclude that the intention must have been to authorize a better and more - *318 effectual security than the general powers of the corporation would .allow. If any effect is given to that intention, or any practical and consistent operation to the language in which it is expressed, the two particulars which have been mentioned, must be embraced. .'Such must have been the understanding of those concerned—such, we know, from the'history of the time, and from documents in this •case, was the understanding of those who offered and of those who received the pledge. That understanding is, we think, fully sus■tained by the construction of the authority under which it was acted upon; and good faith requires that the expectation thus ore.•ated should not be disappointed.
Although the conclusion we have reached must depend upon the •proper construction of statutes of this state, it is satisfactory to know that so often as a similar question has arisen, upon similar •statutes of other states, a like conclusion has been attained. Pierce v. Emery, 32 New Hampshire, 484; Phillips v. Winslow, 18 B. Mon. 431; *Seymour v. Canandaigua & Niagara Falls Railroad Company, 25 Barb. 284-308.
Having ascertained what the corporation was authorized to pledge or mortgage, we have next to consider the acts done, which ■•are claimed to be an exercise of that authority. On the first day ■of November, 1851, the Columbus, Piqua and Indiana Eailroad •Company executed a deed in trust, or mortgage, to George S. Coe, to secure the payment of six hundred bonds, of $1,000 each, pay•able on the 1st day of January, 1862, and bearing interest at the rate of seven per centum per annum, payable semi-annually, on the •first days of July and January, commencing on the 1st of July, 1852. This mortgage purported to convey the property then held, •and to be thereafter acquired, and all franchises, rights, and privileges of the company, of, in, to, or concerning the same. The de•seription being.sufficient to embrace any property, real or personal, •and any rights or franchises connected with the property which the authority granted to the company would permit them to convey. This mortgage appears to have been duly executed and re- ■ corded. On the 21st day of July, 1852, another deed in trust, or mortgage, of the same purport, was executed to the same party, 'being in confirmation of the former, and given and made to correct an error recited and set forth in the latter. This also appears to 'have been duly executed and recorded. The bonds mentioned ;and specified in the mortgages, were made and negotiated by the *319 company, and are outstanding in the hands of the holders thereof and no interest has been paid since the 1st Of July, 1855. It appears, by a recital in the mortgage, that one object of the loan, and the exer cution of the bonds to secure the payment thereof, was the purchase of iron rails ; and it also appears that two hundred and ninety-five •of the. bonds were used in the purchase of iron rails. On the 1st day of January, 1853, the company executed another deed in trust, or mortgage, to George S. Coe, to secure four hundred bonds, of $1,000 each, payable on the 1st day of January, ^1863, and bearing interest at the rate of seven per centum per annum, payable semi-annually, on the 1st days of July and January, commencing on the 1st day of July, 1853. This mortgage has the same description of the property and rights intended to be ■conveyed as the first, and is made subject to the satisfaction of that mortgage. There is claimed to be a defect in the execution and acknowledgment of this mortgage. It was placed on record in the •several counties, as required by law. The bonds mentioned and specified in this mortgage, were made and negotiated by the company. On the 1st day of April, 1854, the company executed to Elias Fassett a deed in trust, or mortgage, to secure six hundred bonds, of $1,000 each, payable on the 1st day of April, 1869, and bearing interest at the rate of seven per centum per annum, payable semi-annually, on the 1st days of April and October, commencing on the 1st day of October, 1854. This mortgage describes, in the same manner as the first and second, the property conveyed or intended to be conveyed, and is made subject to those two mortgages, which are described as securing, in the aggregate, one million of dollars ; andas being duly recorded in the counties through which the road passes. This mortgage appears to have been duly executed and recorded. The bonds mentioned and specified in this mortgage, were made and negotiated by the company. But it appears that these bonds were sold by the company at less than fifty-one cents on the dollar; that only fifty-eight of the first mortgage bonds were sold by the company at par, the residue being sold atfrom seventy-five to eighty-seven and one-half cents on the dollar; and that the second mortgage bonds were all sold by the company at from seventy-five to ninety cents on the dollar. All of said bonds are now in the hands of bona fide holders, and worth, in the market, much less than par, and have been so ever since their first sale by the company.
Several objections have been made to the validity of these bonds *320 and mortgages, which we have now to consider. It is claimed that “ the corporation has no power *to contract for the payment, of interest, either semi-annually or at any other time before the money borrowed falls due.” The two sections which have been before cited, authorizing the company to borrow money, it is argued, must be construed together, and that there is nothing in the latter which affects the limitation, as to the rate of interest contained in the former; the meaning of the two sections being that, “ The company may borrow money, at a rate of interest not exceeding seven per cent, per annum, and may give bonds therefor, payable at such times and places as the parties may agree upon.”
We think it is entirely clear that the legislature only intended to-limit the rate of interest, and that a construction which would forbid any payment of interest until the payment of the principal, would be unreasonable, and unauthorized either by the letter or spirit of the statute. Whenever an authority is conferred and the particular mode in which it is to be exercised is not specified, if it relates to a subject-matter as to which the dealings and transactions of men have established a usual and ordinary mode, that may be adopted. The rate of interest is limited, but there is no provision as to the-time of its payment; if the rate be not exceeded the payment of the interest may be regulated according to the usual course of dealing in borrowing money and paying the price or compensation for its-use. Interest being the price or compensation for the use of money, or, so to speak, what the money earns, it is not strictly taken in advance, if the upe precedes the payment. When the uséis for a short period, it is not usual in ordinary -transactions to require the compensation until the end of the period : when the uséis for a long period, it is; and whether, as the price or compensation accrues from the use, or is earned by the money, payments are to be made at intervals of a year or six months, can, in principle, make no difference. Such is the ordinary mode of dealing, and we see no reason why it might not be, legally and properly, adopted *by the corporation. Our attention has been directed to a number of railroad charters in which it is provided that payment of interest shall be made semi-annually. This appears to us rather as evidence that a jjayment in that manner was in accordance with the usual course in such transactions, than as,,indicating that, in the-absence of such a provision, the same manner might not be adoj)ted, *321 We are satisfied that this objection to the validity of the bonds can not be sustained.
The next objection to be considered relates to the validity of the mortgages. Thepower was to secure the payment of money borrowed at a rate of interest not exceeding seven per cent, per annum; and this power, it is claimed, does not extend to the securing the payment of bonds sold at less than par, or exchanged for iron rails. Undoubtedly this would be a very serious objection if there had been no other legislation upon the subject. But by an act passed on the -3d of March, 1851, it was enacted that “ The directors of any railroad company are hereby authorized to sell or negotiate the bonds or notes issue'd by said company, or received by it in pay-of subscription to its capital stock or otherwise, at such times and at such places, either within or without this state, and at such rates as in their opinion will best advance the interest of such company; and if such bonds or notes are thus sold at a discount, such sale shall be as valid in every respectas if sold at. their par value.” Swan’s Stat. 200, note. And by another act, passed on the 3d of March, 1852, it was enacted: “That the directors of any railroad company, authorized to borrow money and execute bonds or promissory notes therefor, shall be, and they are hereby, authorized to sell, negotiate, mortgage, or pledge such bonds or notes, as well as any notes, bonds, scrip, or certificates, for the payment of money or property which such company may have heretofore received, or shall hereafter receive, as donations, or in payment of subscriptions to the capital stock, or for other dues of such company, *at such times and in such ¡daces, either within or without the state, and at such rates and for such prices as in the opinion of said directors will best advance the interests of such company; and if such notes and bonds are thus sold at a discount, such sale shall be as valid in every respect, and such securities as binding for the respective amounts thereof, as if they were sold at their par value.” Swan’s Stat. 240.
The objection therefore turns upon a question of construction. It is claimed that while the first statute undoubtedly authorized a sale of bonds issued by the company at a discount, and made them as valid in every respect as if sold at par, this validity must be understood in view only of a liability upon the bonds as evidences of indebtedness, to be enforced by action against the company, and did not extend to the security which the company was authorized to give by a pledge or mortgage of its property. The statute must, *322 we think, be taken, for the purpose of construction, in connection with the former provisions upon the same subject, which have been cited. Those provisions very clearly contemplated an issue of but one -description of bonds, which were to be executed for money borrowed, and their payment to be secured by a pledge or mortgage of the property and income of the company. By the act of 1851, the directors of the raih’oad company were authorized to sell or negotiate “the bonds issued by such company,” referring, we think, to a definite description of bonds, as to which a previous authority had been given ; and that description embraced the aggregate amount of the bonds, the sums in which they were to be issued, and the security to be given for their payment. The only object of the act was to take off the restriction, which might be inferred from the rate of intei’est, that they could not he sold at less than par. "We feel so entirely clear that this is the proper construction of the act of 1851, that we need not inquire whether *the act of 1852 is more explicit, or how far it applies to the bonds and mortgages in this ease.
But it is urged, that for some of the bonds secured by the first ¡mortgage there was received, not money, but iron rails, and that stho mortgage was made with that view, and was therefore invalid. ¡Practically, the only objection to receiving for the bonds property ¡needed -by- the company instead of money, would be that it might >be a device to dispose of the bonds at less than their par value, Jf in fact the par value of the bonds was received, it could make mo conceivable difference whether it was in money or in money’s •worth. But when authority is given to negotiate the bonds at less ¡than their par value, there can be no possible propriety in acting »upon any such distinction. If we have correctly construed the ¡act of 1851, it allowed the company to dispose of the bonds, with ■the mortgage security, at less than their par value. It could then ¡make no difference whether the bonds were sold at a reduced rate .and the iron rails bought for cash, or the bonds exchanged directly ■for the iron rails; and the transaction might easily be made to assume either form. We know of no rule applicable to such cases ■as the present, that will prevent our taking the statutes together • and giving them a just and reasonable construction.. And when ■we clearly see what was the intention of the legislature, we are not bound to give to the language an interpretation that would be *323 strained and unreasonable. Perrine v. Chesapeake and Delaware Canal Co., 9 How. 172-192.
Having disposed of the objections to the validity of the mortgages, and found that they are valid securities upon the property and rights which the law authorized the company to pledge, we have to inquire into their effect and operation, both as regards the priority between them and the claims of other parlies. It is evident from an inspection of the mortgages, which are in the ordinary form of railroad mortgages, and contain the usual conditions %nd stipulations found in such mortgages, that it was the intent of the parties to create a security, on the entire property of the company and the profits to be derived from its use and operation as a railroad, for a permanent investment of capital, so that the parties investing might rely, for a number of years, upon receiving a semi-annual interest, and at the end of the time the return of the principal. The arrangement would necessarily authorize and require the directors of the company to operate the road and .out of the earnings pay the interest as it accrued, preserving the property as a security for the interest and the principal. But this arrangement was clearly intended as a security merely for the payment of the bonds executed for money borrowed, and an arrangement for any other purpose would not have been authorized by the power under which the company acted.
It can not be supposed that it was even understood by the parties to the arrangement, that it gave a right as against the claims of third persons, to insist that the directors of the company should use the entire property and income, for the whole period the loan had to run, so that they might be able to comply with the terms of the arrangement. Their acts show the contrary, for we find that there was a second mortgage executed to the trustee in the first, and afterward a third mortgage given upon the same property. ' If other liens might be created upon the property conveyed under the special power, which we have no doubt could be done, as the power would not be exhausted until bonds had been executed to the amount authorized, we see no reason why other liens might not be created upon that part of the projmrty subject to the disposition of the company under its general powers. The effect of the provisions authorizing the pledge or mortgage for borrowed money, operates, as we have .held', to extend the powers of the company as to the nature and character of the property it might *324 convey. This extension of power could in no way operate as a restriction of Mother powers as to the disposition of property. The provisions in the law were permissive—the company was not bound to borrow money in that way or with that security—it was left entirely free to exercise its general powers. We find, then, in the provisions no exemption of the property of the company from the operation of lions or claims created by its own acts, or resulting foom judicial proceedings. Those who take a mortgage upon property to secure a loan for a long period of time, however desirable it may be to have the arrangement carried out, may be disappointed, owing to an imj>erfection incident to such an arrangement—an imperfection resulting from the policy of the law, that parties can not be permitted to retain indefinitely the use and enjoyment of property, by simply giving a security upon it for the payment of a debt. The property must be subject in some form to the just claims against the party subsequently arising, and this will frequently and necessarily lead to an interruption and disappointment in a prior arrangement, as to the time within which it is to be performed.
It follows from these views that while, as between the company and the first mortgagee, the property may well be regarded as an entirety (and this is perhaps shown from the whole scope of the instrument, and may affect in several particulars their respective rights, into a consideration of which we are not led by any circumstances in this case), such a result, from the acts of the parties to the mortgage, can not affect the rights of other parties, upon which we are required to adjudicate. The company did not denude itself of the power to execute other mortgages upon the same property, or upon any part of it, which they had the legal right to dispose of, and certainly could not by its own act exempt from the claims of its creditors any part of its property. The mortgagee, then, standing in the same position as an ordinary mortgagee who has given an extended credit, or put money at interest for a number of years, can not object to the creation of- other *legal liens upon the property embraced in the mortgage. When those liens are sought to be enforced by a removal of the property, he might justly complain if his security was thereby endangered. Upon what grounds, in what manner, and to what extent relief would be given in such a case, we are not now called upon to decide, further than to say it could not be. upon the ground of any exemption from *325 liability for other debts, which the parties to the mortgage might attempt to create.
This brings us to the consideration of the claim of a creditor in this ease. It appears that the defendant Hilliard, on the 10th of March, 1857, recovered a judgment for the sum of $8,009.74, with costs of suit, “ for moneys advanced by said Hilliard in payment. of interest for said company, and taxes assessed against said company, and for certain rights of way paid by said Hilliard;” and that Hilliard caused an execution, issued on his judgment, to be levied on a part of the railroad of the company, together with the rails, superstructure, bridges, viaducts, and appurtenances; also, upon two steam locomotives and tenders attached; upon two first-class passenger-cars and two second-class passenger-cars; one baggage car, and a number of box or freight cars; also, two iron safes, one in the depot-house, and the other in the ticket-office at Columbus; “which said judgment is still unpaid, and said levy still standing.” It also appears that the judgment in favor of Hilliard was recovered, and the levy of the execution thereon made, after the appointment of the receivers in this case by the court of common pleas, and whilst the property so levied upon was in the hands of said receivers, under the order of that court.
From what has been before said, it obviously results that, as to the real estate levied upon, the same being part of the railroad, the lien of the legal mortgages would prevail over the claim of the creditor. His right to levy on a part of the railroad, or on the real estate held for the use of the franchise of the corporation, has not been pressed *in.argument. We have already intimated that as to an interest in real estate held for the sole and exclusive purpose of the exercise of a franchise, it could not be alienated by the corporation, and of course would not be liable to execution. Such, we are inclined to think, is the character of the interest in this case; but we do not feel called upon to make a definite decision. It would, in view of any rights of the defendant Hilliard, be a mere abstract question, when the validity of the mortgages has been affirmed. The contest, on the part of that defendant, has been to obtain satisfaction out of the personal property, and particularly that part of it acquired after the date of the last mortgage.
A very serious objection exists to the claim of the defendant Hilliard, upon the ground of his levy having been made while tho *326 property was in the custody of a receiver of the court. We ineline to think that the court of common pleas might very properly have ordered the sheriff to withdraw his levy and answer to the court for a contempt in making it. Such appears to have been the course pursued by the lord chancellor, in the case of Russell v. The East Anglian Railway Company. 6 Rail. Oas. 501-522. But no such step was taken, and the finding of the court, although .it shows the fact of the levy having been made while the property was in the hands of the receiver, also shows that the judgment is unpaid and the levy still standing. We may, therefore, in the absence of any objection, infer that the court permitted the levy, so as to enable the judgment creditor to secure any rights to the property which a levy would give, in the event the claims in the action, in which the receiver was appointed, should not be prosecuted, or should not be maintained.
We have already held that the judgment creditor would have a right to levy upon such personal property as is described in the return upon the execution in this case; and that the mortgages, though covering the property, would not prevent creditors, -by a levy upon it, from obtaining a *lien, as to any interest of the mortgagor subject to the levy, such as possession coupled with a beneficial use. Curd v. Wunder, 5 Ohio St. 92. And we have also held that the mortgages which were duly executed and recorded, created a lien upon the after-acquired property, of which the property levied on constituted a part. But a defect is claimed to exist in one of the mortgages. It was executed in New Yozzk, and acknowledged before a commissioner appointed under the laws of Ohio, but having no authority under the laws of New Yoz’k. This mortgage has but one witness. As the question, whether such a mortgage would be valid, as a legal mortgage, may azdse in cases where the merits of the controversy will more depend upon its solution, we feel at liberty to pass it by, for, assuming that the second mortgage is to be regarded as-a mere executory contract, we think that, under the circumstances of this case, it must be preferred to the claims of the creditor. The action was brought to enforce the claims of those interested in both mortgages. As against the company, there was a right to relief, whether the mortgage be regarded as a legal or equitable claim. The mortgage at least showed a contract, which a court of equity would have directed to be perfected. There was, then, a Us pendens, *327 which a subsequent claim could not defeat. It appears, moreover, that a receiver was appointed, who took actual possession of the property; and this must, we think, if it were necessary, be regarded as tantamount to a possession by the mortgagee. ' In any view, therefore, the claim of the defendant Hilliard, as a judgment creditor, must be postponed to the mortgages.
It appears that the consideration of the debt, for which the defendant, Hilliard, recovered a judgment, was for moneys advanced in payment of interest and taxes, and for right of way. This, it has been suggested, gives him an equitable claim, as against the mortgagees. "We have already adverted to the peculiar position in which the *nature and character of the mortgages place the directors of the company and the mortgagees. The directors acquire property for the use of the road: this may be done from the earnings of the road, with money borrowed, or upon a credit. But the property acquired becomes the property of the company, and thereupon subject to the mortgages, undey the construction we have felt bound to give to the statute. Those who advance money, or sell on credit, to the directors of the company, are bound to take notice of the claim which will arise under the mortgages, which are required by law to be recorded in each of the counties through which the road passes; if they part with their money or property without taking security, we know of no principle upon which one can be created for their benefit. We are not inclined to exempt the company, or the mortgagees, from the application of any rule of law which would properly apply to the dealings between them, or to the property which is the subject of those dealings, and which would secure or protect ,the just claims of third persons. But we are bound to •respect the claims of the mortgagees, and do not feel authorized to modify the settled rules of law which govern the dealings of third persons with the ■ directors of the company, so as to impair that security which the mortgagees, under the terms of a contract authorized by law, have obtained. It is possible particular cases may arise, which, owing to the peculiar relation between the directors of the company and the mortgagees, as to the use and disposition of the property and income, may present equitable considerations calling for relief. But we need not discuss or conjecture the character of such cases. It is sufficient to say that none of the claims in this case present such considerations.
It is proper to notice here a question as between the second and *328 third mortgages, growing out of the same defect in the execution of the second mortgage, which has been before mentioned. Upon the principles which have *been stated, applicable to mortgages of real estate, even notice of a prior equitable mortgage would not make it valid as to a subsequent mortgage. Does this principle apply to the third mortgage in this case? We think it does not. It was not intended by the statute, upon the construction of which the principle depends, to give to any mortgage, upon the ground of its prior record, an effect forbidden by the very terms of the mortgage itself. The third mortgage is expressly made subject to the first and second mortgages, and, according to the clear intent of the parties expressed upon its face, can only operate as a security upon that part, or so much of the property as is not required for the payment of the bonds mentioned and specified in the first and second mortgages.
We are now able to state our conclusion, as to the position in respect to priority of the different claims which have been considered. The first' mortgagee has the first lien upon all the property; then the .second; and then the third; and then the judgment creditor, as to the personal property upon which he has been permitted to, secure a lien by his levy. And it now remains to inquire in what hnode the property is to be disposed of, to satisfy those claims. It is the necessary result of the principles, which have been announced, as applicable in this case, that the parties are entitled to a sale of the property. That property, according to the conclusion we reached, after an extended examination of the question, is both real and personal. It may be, that under the contract between the company and the mortgagees, and for some of the purposes shown by that contract, the property should be regarded as an entirety; but even as between the parties to that contract, when it has been broken and a remedy is sought, the reason for preserving the entirety of the property cease. The remedy must be taken in conformity with the rules of law, and the practice of the court, applicable to the description of property, which is the subject of tho ^contract. The sale, therefore, of the real estate must be made according to the rules governing sales of real estate.
We regard the plaintiff as proceeding for a sale of real estate, under a mortgage, and that real estate one entire tract, though situated in two or more counties. Considered as an entire tract, indivisible for the purpose of sale, it fairly comes within the provis *329 ion as to the jurisdiction of the court. Code, sec. 46. It should, therefore, be sold as an entire tract; and the proceedings incidental to the sale will, of course, be in the county in which the court sits. With the real estate, and connected therewith, the franchise of the corporation to maintain the railroad, and demand compensation for the transportation of passengers and property, must be sold. This franchise will be taken by a purchaser, with the rights and subject to the restrictions prescribed by law. If other facilities and means for its beneficial enjoyment, than those now provided by law are required, we can not doubt but that, upon a proper appeal to the legislature, they will be supplied. It is the settled policy of this state—it has been the uniform practice, and we think, upon a fair construction, it is the requisition of the statute, that there shall be an appraisement in a proceeding for a sale of real estate under a mortgage. We do not feel, therefore, that we would be authorized to exercise a discretion, or to sanction the exercise of a discretion, to order otherwise. Indeed, if it were a matter of discretion, in our opinion, an appraisal would be just and proper, and we can see no practical difficulties in making that appraisal.
It is said, there may be difficulty in correctly ascertaining the value of such ¡iroperty. Such difficulty not unfrequently arises as to other real estato. Improvements are constantly being made and connected with real estate, the value of which, comparatively few persons can appreciate. It may be that any three freeholders selected without reference to the duty to be performed, might not be able to make a correct estimate of the value of a railroad *and the franchise of making profit from its use. But we are not to suppose that the officer authorized to sell the property, will take no care in the selection of appraisers, and wo can not doubt but that three competent men may be found. The very difficulty of ascertaining the value, makes it the more important that every precaution which the rules of law will permit, should be used to prevent a ruinous sacrifice of the property. If a careful examination of the pi’operty be made by competent persons, their estimate’ of its value will give confidence to purchasers, and probably be the means of a sale at a higher price.
We have said that as to an appraisement, there is no discretion ; but as to matters connected with it, we think there is a discretion to supervise the proceedings of the • officer ; and a more stringent or more liberal rule, as the case may require, than the one ordin *330 arily adopted, may well be applied, on account of the peculiar character of the property.
In like manner, as to the personal property, wo think the court may, in its discretion, take such steps as will probably lead to an advantageous sale and prevent a sacrifice. There will also be a discretion to guard against the failure of a sale, and the consequent expense and delay, by requiring a deposit of money, or other satisfactory security, that the terns of the sale will be complied with.
There is a question connected with the distribution of the proceeds of any sale which may be made, to which our attention has been directed. The court was asked to allow, to the mortgage trustees and their counsel, a compensation for services, and to charge it on the fund to be realized from the sale. The court directed an allowance, but ordered it to be deducted out of the amount coming to the.respective parties upon distribution. We think the court erred in making any order whatever upon the subject.-
*We do not understand that the mortgagees in this case came before the court in the character of trustees of any property or fund, which would authorize the court to charge upon that property or fund their expenses. They are not, and never have been, in possession of the property. They hold a legal title as security for certain creditors of the company, and in substance it is the same thing, for the purposes of this action, as if the title had been conveyed directly to the creditoi’S. There was a convenience in selecting some person to take the title for the benefit of those to whom the bonds might be negotiated. The mortgagees in this case, who assumed that office, might very properly have stipulated with the company for a compensation, and perhaps did so. But we can not now recognize them in any other character than as ordinary mortgagees, and feel no more at liberty to pay them for their trouble, or to pay their counsel fees, out of the proceeds of a sale of the property, than we would in any ordinary case.
We are aware that in the instruments executed by the company, which are all in the same form, there are provisions which purport to create a trust, or a power to sell. We should infer, from several of the provisions in the instruments, that they were drawn with but a limited knowledge of, and apparently without reference to, the laws of this state. Wo certainly do not understand that we are called upon to aid in the execution of that trust, or that a sale, *331 Tinder tbe authority which the instruments purport to give, is desired. The instruments also contain the proper elements of a mortgage. There is a conveyance of the title, to secure the payment of money and interest thereon, with a defeasance. It is that part of the instruments which we think the court is required to enforce, and in view of which only we have sustained the claims of the mortgagees in this action. They must take their relief upon the same terms as others are required to do who hold a like security. However desirable and just it may appear, in particular leases, to charge upon the defendant, or his property, the fees of the counsel who represent the plaintiff, such is not the policy of this state. Even the small docket-fee once allowed was abolished by the legislature. "We know of no rule or principle which will entitle us to deviate from that policy in this caso.
The position in which we have held that the mortgagees stand dis]30scs of another question which has been presented. They are entitled to receive the money coming to those for whose benefit they hold the securities; and with them, and not with the bondholders, any contest as to the amount due upon those securities must be made, and must be made upon an issue in the action. The bondholders are not necessary, or even proper, parties to the action, and the order requiring them to appear and prove their claims before the receiver is erroneous. It is true that the bondholders might have a right to intervene, if the mortgagee acting for them was not responsible, or was likely to prove unfaithful to his trust; but that is a matter entirely between them and the mortgagee. The only concern of the company, after the amount due upon the security has been ascertained, is,'that at the time, or before, any payment is made, the bonds, being negotiable and not due, should be produced and canceled, if paid in full, or credited on their face with the amount paid. It would be the duty of the court to secure this protection against further liability to the company. This protection does not require that all tbe bonds should, be produced, or that an account should be taken of the claims of those who hold them. Each bond, by the terms of the security, stands as an independent claim, entitled to its proper proportion of any fund which may be realized. Payment, therefore, may and ought to be made to the extent the bonds are produced, and canceled or credited. If there be a question as to the title to any of the bonds, or a question as to the proportion of the fund coming to any bond lost or *332 destroyed, or any question between the mortgagee and any bondholder, the ^contest between those interested may be settled in a supplementary proceeding, or in another action, and such difficulties need not be anticipated.
Wo believe that we have disposed of all the questions which have been presented for our consideration, except one which is collateral ’arising upon a cross-petition filed by Lincoln Goodale. The substance of the claim of Goodale is, that by an arrangement between him and the company, the latter was allowed to enter upon his lands and construct its road thereon, with such works as might be necessary for its completion; that within one year appraisers should be selected, and make an award of the amount to be paid to Good-ale for such use of his land; that the amount of such award should be paid to Goodale within sixty days after it was made; that upon failure the license to enter upon and the right to use the lands should cease, and any right or interest of the company under tho agreement, and its fixtures and works, should be and remain the property of Goodale, “as if said agreement had not been made, and said company had, without authority, and in its own wrong, entered upon said land and made said road through the same.” The award having been made, but the payment of the amount awarded not made within the time, the court was asked to enforce, by injunction against the company and the receiver, the right of Goodale under tho agreement, and to restrain the company from any use of the track constructed upon the lands.
When a party voluntarily allows, for a stipulated consideration, such use of his property, he can not by agreement secure a right to such an extraordinary remedy as an injunction. The insertion in the agreement of a stipulation that, in the event of its non-fulfillment, the party thus using the property is to be regarded as using it wrongfully and without authority, can not make the fact so, in view of such a remedy. It is rather in the nature of a for-
feiture, which a party certainly can not come into *a court of equity to enforce by an injunction. We think, therefore, that the court very correctly refused the injunction asked by Goodale, and properly left him to pursue such legal remedies as he might be advised to pursue. The only application ho could, probably, with any propriety make in this case, would be for permission to proceed in an action against the receiver to recover the possession of tho property.
For the other errors, which have been pointed out, the judgment of the court of common pleas must be reversed.
Brinicerhoee, C. J., and Scott, Sutlxpp, and Peck, JJ., concurred